FIRST INVESTORS CORPORATION, First Investors Management Company, Inc., First Investors Consolidated Corporation, First Investors High Yield Fund, Inc., and First Investors Fund for Income, Inc., Plaintiffs–Appellants–Cross–Appellees,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant–Appellee–Cross–Appellant.

Docket Nos. 97–9407, 97–9435.

United States Court of Appeals, Second Circuit.

Argued July 17, 1998.

Decided Aug. 6, 1998.

Philip R. Forlenza, Patterson, Belknap, Webb & Tyler LLP, New York City (Stephen P. Younger, Roosevelt N. Nesmith, on the brief), for Appellants.

Marshall T. Potashner, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Herbert Dicker, on the brief), for Appellee.

Before: CABRANES, POOLER, and REAVLEY,* Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

First Investors Corporation and its affiliates (collectively, "First Investors") brought this action seeking insurance coverage under policies it purchased from Liberty Mutual Insurance Company ("Liberty Mutual"). The coverage sought included Liberty Mutual's duty to defend First Investors against multiple claims of emotional distress arising out of investors' economic losses. Liberty Mutual denied coverage, asserting that the claims fell outside the terms of the policies it issued to First Investors. On February 28, 1997, the United States District Court for the Southern District of New York (Kevin T. Duffy, *Judge*), granted summary judgment in Liberty Mutual's favor and dismissed First Investors's complaint. *See First Investors Corp. v. Liberty Mut. Ins. Co.*, 955 F.Supp. 274 (S.D.N.Y.1997). On October 28, 1997, the district court granted summary judgment for First Investors and dismissed Liberty Mutual's counterclaim for breach of contract. First Investors appeals from the district court's order granting summary judgment in Liberty Mutual's favor and dismissing First Investors's complaint, and Liberty Mutual cross-appeals from the district court's dismissal of its counterclaim.

## I.

The following facts are undisputed for the purposes of this appeal. First Investors sells mutual funds to investors, and for many years it purchased comprehensive general liability ("CGL") insurance policies[1] and umbrella excess liability insurance policies (the

---

* The Honorable Thomas M. Reavley of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. All of the CGL policies at issue provide, in pertinent part, that Liberty Mutual must:

pay those sums that ... [First Investors] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.... The "bodily injury" or "property damage" must be caused by an "occurrence...." [Liberty Mutual] will have the ... duty to defend any "suit" seeking those damages even if the allegations of the suit are groundless, false or fraudulent.

The CGL policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

"excess policies")[2] from Liberty Mutual. In the early 1990s, First Investors was sued in twelve actions (the "underlying actions") filed in state courts across the country by purchasers of funds sold by First Investors's representatives.[3] The complaints in the underlying actions essentially allege that First Investors fraudulently targeted unsophisticated investors, mostly retirees, and sold them highly volatile "junk bond" mutual funds while assuring them that the investments were safe for purchasers living on a fixed income. Several of the complaints allege that First Investors selected inexperienced representatives to sell the funds and trained them to use "scripts" in their sale presentations, that included such phrases as "completely safe," "absolutely no risks," "conservative," "stable," and "you can't lose." Each of the claimants alleged losses of thousands of dollars and resulting emotional distress.

Concerned that one of its claims examiners had misled First Investors regarding the availability of coverage, Liberty Mutual agreed to provide coverage for two suits, *Hanley* and *Barbosa*, subject to the terms and conditions of a settlement agreement. The settlement agreement provided, in pertinent part:

> 2. All of the excess policies at issue provide, in pertinent part, that:
>
>> a. [Liberty Mutual] will pay those sums in excess of the retained limit that the insured becomes legally obligated to pay as damages because of:
>> (1) bodily injury;
>> (2) property damage;
>> (3) personal injury; or
>> (4) advertising injury;
>> to which this policy applies and caused by an occurrence.
>
> The definition of "personal injury" contained in the excess policies includes "[i]njury to the feelings or reputation of a natural person."
>
> Importantly, the excess policies also contain a "Banks and Financial Institutions" endorsement, which provides, in pertinent part:
>
>> This policy does not apply to bodily injury, property damage, personal injury or advertising liability arising out of:
>> *       *       *       *       *       *
>> 3. The loss, depreciation in value, or damage to any real or personal property, including, but not limited to, money, securities, negotiable instruments or contracts representing money, held by or in the care, custody or control of the insured.

The transfer of the $3,450,000.00 from Liberty Mutual Insurance Company to [Liberty Mutual's escrow agent] for the settlement of the above captioned lawsuits shall not be considered an admission of any nature by Liberty Mutual Insurance Company as to the availability of insurance coverage or insurance proceeds with respect to any other claims or lawsuits pending against First Investors Corporation, or others, similar in any manner to the allegations contained in the *Hanley* or *Barbosa* lawsuits, and the *payment of the Settlement Funds shall not be admitted into evidence in any proceeding regarding the applicability of insurance coverage* under any policy of insurance issued by Liberty Mutual Insurance Company or its affiliated companies.

Joint Appendix at 901–92 (emphasis added).

First Investors settled all of the remaining underlying claims with the claimants except for the *Bonner*[4] and *Parsons* suits.[5] In January 1995, First Investors sued Liberty Mutual in district court seeking defense costs and indemnification in the ten remaining underlying actions pursuant to the terms of the CGL and excess policies. Because First In-

> 4. Errors or omissions committed or alleged to have been committed by or on behalf of the insured in the conduct of the insured's business activities as a Bank or Financial Institution.

3. The twelve underlying claims filed are identified as: *Tarver v. First Investors Corp.* (NASD, New Jersey); *Corley v. First Investors Corp.* (Oklahoma); *Wilson v. First Investors Corp.* (Oklahoma); *Parsons v. First Investors Corp.* (Missouri); *Rayhill v. First Investors Corp.* (West Virginia); *Quinn v. First Investors Corp.* (West Virginia); *Crossley v. First Investors Corp.* (Alabama); *Crow v. First Investors Corp.* (Alabama); *Ingrum v. First Investors Fund for Income, Inc.* (Alabama); *Bonner v. First Investors Corp.* (Alabama); *Hanley v. First Investors Corp.* (Texas); and *Barbosa v. Adams* (Texas).

4. According to Liberty Mutual, *Bonner* is still pending.

5. *Parsons* proceeded to judgment, resulting in an award against First Investors of $26,949 in compensatory damages and $300,000 in punitive damages. *Parsons v. First Investors Corp.*, 122 F.3d 525, 530–31 (8th Cir.1997).

vestors included in its complaint information concerning Liberty Mutual's payment of the settlement funds in *Hanley* and *Barbosa*, Liberty Mutual amended its answer and counterclaimed against First Investors for breach of the settlement agreement.

In August 1995, First Investors moved for partial summary judgment solely on Liberty Mutual's duty to defend. On February 28, 1997, the district court denied First Investors's motion and, *sua sponte*, searched the record and granted summary judgment in Liberty Mutual's favor, dismissing First Investors's complaint in its entirety because "the documents before this Court show that First Investors has no case." *First Investors Corp.*, 955 F.Supp. at 279. The district court noted, however, that the case was not closed due to the existence of Liberty Mutual's counterclaim. *See id.*

On June 17, 1997, Liberty Mutual moved for summary judgment on its counterclaim, alleging breach of the settlement agreement, and First Investors cross-moved for summary judgment dismissing Liberty Mutual's counterclaim. On October 28, 1997, the district court granted First Investors's motion and dismissed Liberty Mutual's counterclaim. The district court held that, as a matter of law, the settlement agreement did not preclude First Investors from referencing Liberty Mutual's agreement to fund the settlement of *Hanley* and *Barbosa* in its complaint or its motion for summary judgment—First Investors had merely agreed not to seek its "admi[ssion] into evidence." The district court had explicitly stated that it did not consider the settlements in its February 28, 1997 ruling on First Investors's motion for summary judgment on whether Liberty Mutual had a duty to defend. *See First Investors Corp.*, 955 F.Supp. at 276. Accordingly, the district court concluded that the terms of the settlement agreement had not been breached.

On appeal, First Investors challenges the district court's grant of summary judgment in favor of Liberty Mutual and dismissal of First Investors's complaint. On cross-appeal, Liberty Mutual challenges the district court's ruling granting First Investors's motion for summary judgment and dismissing Liberty Mutual's counterclaim for breach of contract.

## II.

■ A district court's grant of summary judgment is reviewed *de novo*. *See Westport Bank & Trust Co. v. Geraghty*, 90 F.3d 661, 668 (2d Cir.1996). Because this is an action based on diversity of citizenship, we apply New York law. *See, e.g., J.Z.G. Resources, Inc. v. King*, 987 F.2d 98, 102 (2d Cir.1993), *cert. denied*, 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993). If New York law is "uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the ... state would resolve the uncertainty or ambiguity." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994). We give the "fullest weight to the pronouncements of the New York Court of Appeals." *Id.* Where that court has not spoken, we "apply what [we] find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." *New York v. Blank*, 27 F.3d 783, 788 (2d Cir.1994) (quoting *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967)). "Finally, we may also consider relevant cases from other jurisdictions." *Id.*

## III.

■ Whether Liberty Mutual has a duty to defend First Investors against the emotional distress claims asserted in the underlying actions turns on whether the CGL and excess policies provide coverage for such claims. It is well settled under New York law that an insurer's duty to defend is "exceedingly broad," and broader than its duty to indemnify. *Continental Cas. Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 648, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993). It is not, however, without limits. *Cf. Keating v. National Union Fire Ins. Co.*, 995 F.2d 154, 156 (9th Cir.1993). Determining whether an insurer has a duty to defend "requires an examination of the policy language and the allegations of the complaint," *Smith Pontiac–GMC Truck Ctr., Inc. v. Hartford Accident Indem. Co.*, 194 A.D.2d 906, 907, 599 N.Y.S.2d 308 (3d Dep't 1993), to see if " 'the

underlying complaint alleges any facts or grounds which bring the action within the protection purchased.'" *Blank*, 27 F.3d at 790 (quoting *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 310, 486 N.Y.S.2d 873, 476 N.E.2d 272 (1984)). In so doing, however, a "court should not attempt to impose the duty to defend on an insurer through a strained, implausible reading of the complaint that is linguistically conceivable but tortured and unreasonable." *Northville Indus. Corp. v. National Union Fire Ins. Co.*, 89 N.Y.2d 621, 634–35, 657 N.Y.S.2d 564, 679 N.E.2d 1044 (1997) (internal quotation marks omitted).

■ The first question presented is whether the emotional distress arising out of the economic losses sustained by the underlying claimants constitutes "bodily injury" under the CGL policies. First Investors asserts that Liberty Mutual had a duty to defend it in the underlying actions because, in its view, the New York Court of Appeals has authoritatively held in *Lavanant v. General Accident Ins. Co. of America*, 79 N.Y.2d 623, 584 N.Y.S.2d 744, 595 N.E.2d 819 (1992), that emotional distress constitutes "bodily injury" under CGL policies. Liberty Mutual contends that *Lavanant* is distinguishable because the CGL policies in the instant case were never intended to cover emotional distress arising out of economic losses of the sort alleged in the underlying claims. We agree with Liberty Mutual and therefore affirm the district court's order dismissing First Investors's complaint.

The CGL policy at issue in *Lavanant* insured a four-story brownstone structure in Manhattan, providing coverage for bodily injury and property damage. *Id.* at 626, 584 N.Y.S.2d 744, 595 N.E.2d 819. When the ceiling collapsed during renovation, the tenants sought damages for emotional distress, even though they had sustained no physical injury. The court held that, in the circumstances there presented, coverage for "bodily injury" did include emotional distress. *Id.*

The question presented by the instant case—whether emotional distress claims stemming from economic losses of the sort alleged in the underlying claims fall within the definition of "bodily injury" in CGL poli-

cies—is apparently a question of first impression in New York. Accordingly, the district court's obligation was to "carefully to predict" how that question would be resolved by the New York Court of Appeals. *633 Third Assocs.*, 14 F.3d at 119. We conclude that the district court accurately interpreted the New York Court of Appeals' decision in *Lavanant*, and properly declined to broaden *Lavanant* to extend CGL coverage to emotional distress injuries arising from the economic losses sustained by the underlying claimants.

The policy at issue here provides that, in order to be covered, the injury in question must be caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." New York courts have interpreted such occurrences to mean "unintended event[s, including] one[s] 'occurring unexpectedly or by chance,'" *Northville Indus. Corp.*, 89 N.Y.2d at 632, 657 N.Y.S.2d 564, 679 N.E.2d 1044, and as "a sudden and instant happening . . . assignable to 'something catastrophic or extraordinary.'" *Michaels v. City of Buffalo*, 85 N.Y.2d 754, 758, 628 N.Y.S.2d 253, 651 N.E.2d 1272 (1995) (citation omitted).

First Investors argues that its alleged fraud was the "occurrence" that caused the emotional distress alleged in the underlying actions. We disagree. As Liberty Mutual points out, it was the economic losses resulting from the diminishment in value of the investments that caused the emotional distress. Simply stated, those economic losses do not constitute an "accident." *Cf. Keating*, 995 F.2d at 156; *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 44 Cal.Rptr.2d 370, 900 P.2d 619, 625 (Cal.1995). There is ample support in New York state case law for the proposition that CGL policies do not cover economic losses. *See, e.g., Hartford Accident & Indem. Co. v. A.P. Reale & Sons, Inc.*, 228 A.D.2d 935, 935, 644 N.Y.S.2d 442 (3d Dep't 1996); *George A. Fuller Co. v. United States Fidelity & Guar. Co.*, 200 A.D.2d 255, 259, 613 N.Y.S.2d 152 (1st Dep't 1994); *Smith Pontiac–GMC Truck Ctr., Inc.*, 194 A.D.2d at 908, 599 N.Y.S.2d 308. First Investors attempts to distinguish these cases, which con-

cern coverage for defective products, on the basis that the only products *it* sells are financial products. In our view, this misses the point that the CGL policies insure against alleged *torts* causing bodily injury (a concept that may include emotional distress), rather than *economic losses* of the sort alleged here that may cause emotional distress.

In sum, under *Lavanant*, emotional distress injuries resulting from an "occurrence"—that is, an "accident" as that term has been construed by New York courts—are covered by a CGL policy. However, nothing in the New York cases suggests, much less directs, that such coverage extends to emotional distress injuries resulting from economic losses of the sort alleged in the underlying claims (or, to put it another way, to emotional distress injuries not caused by an "accident"). Further, there is nothing to suggest that the parties expected such coverage. *See Keating*, 995 F.2d at 156; *Waller*, 44 Cal.Rptr.2d 370, 900 P.2d at 625. We agree with the district court that it is highly unlikely that the New York Court of Appeals would expand the holding of *Lavanant* in this open-ended way.

### IV.

Having affirmed the district court's order granting summary judgment in favor of Liberty Mutual with regard to its coverage obligations under the CGL policies, we turn to the question of whether the excess policies obligate Liberty Mutual to defend First Investors against the emotional distress claims in the underlying actions.

■ Liberty Mutual maintains that First Investors is a "financial institution," and that the exclusion clause contained in the Banks and Financial Institutions endorsement [6] precludes coverage of the emotional distress claims, relieving Liberty Mutual of any duty to defend.[7] In response, First Investors argues that there is such a duty because (1) it is not a "financial institution"; (2) the exclusion clause contained in the Banks and Financial Institutions endorsement therefore does not apply to it; and (3) the emotional distress claims in the underlying actions are thus covered by the terms of the excess policies.

The term "financial institution" is not defined in the excess policies. Nevertheless, the district court concluded that

> the language of the exclusion is clear and the application to these facts equally clear. As First Investors is a financial institution and the Underlying Claims seek damages arising from the diminishment in value of their investments, First Investors is not entitled to indemnification or defense under the [excess] policies.

*First Investors Corp.*, 955 F.Supp. at 279.

■ When interpreting terms in insurance policies, we are to construe the language at issue

> as would the ordinary [person] on the street or ordinary person when he [or she] purchases and pays for insurance, or, in a case such as this one involving a policy issued to a business, by examining the reasonable expectation and purpose of the ordinary business [person] when making an ordinary business contract. The term is not given a narrow, technical definition by the law. It is construed, rather, in accordance with its understanding by the average [person] ... who, of course, re-

> insured in the conduct of the insured's business activities as a Bank or Financial Institution.

---

6. The Banks and Financial Institutions endorsement provides, in pertinent part, that the excess policies do not apply to personal injury arising out of

     \*     \*     \*     \*     \*     \*

  3. The loss, depreciation in value, or damage to any real or personal property, including, but not limited to, money, securities, negotiable instruments or contracts representing money, held by or in the care, custody or control of the insured.

  4. Errors or omissions committed or alleged to have been committed by or on behalf of the

7. In contrast to the CGL policies discussed above, where the definition of "bodily injury" was at issue, the excess policies cover the less-problematic category of "personal injury," which explicitly includes "injury to the feelings or reputation of a natural person." "Occurrence," in the specific context of personal injury, is defined broadly in the excess policies as an "offense" rather than an "accident."

lates it to the factual context in which it is used.

*Michaels,* 85 N.Y.2d at 757, 628 N.Y.S.2d 253, 651 N.E.2d 1272 (alternations in original) (internal citations and quotation marks omitted). Not surprisingly, a favored source of the average person's understanding of a term is the dictionary. *See Jakobson Shipyard, Inc. v. Aetna Cas. & Surety Co.,* 961 F.2d 387, 389 (2d Cir.1992) (assigning a term in an insurance policy the meaning accorded by Webster's Third International Dictionary).

Turning to this lexicographical venture, we find that Webster's Third New International Dictionary defines a "financial institution" as "an enterprise specializing in the handling and investment of funds (as a bank, trust company, insurance company, savings and loan association, or investment company)." *See John H. Sellen Constr. Co. v. State,* 87 Wash.2d 878, 558 P.2d 1342, 1345 (1976); *Jones v. Village of Chagrin Falls,* 116 Ohio App.3d 249, 687 N.E.2d 515, 518 (1997), *appeal dismissed,* 80 Ohio St.3d 1431, 685 N.E.2d 543 (1997). Black's Law Dictionary also includes in its definition of "financial institutions" both "a broker or dealer in securities or commodities" and "an investment company." Black's Law Dictionary 630 (6th ed.1990).

Relying, as instructed by the New York Court of Appeals, on the "average person's" definition of the term, we conclude that First Investors is indeed a financial institution within the scope of the Banks and Financial Institutions endorsement. Accordingly, we agree with the district court that the emotional distress claims asserted in the underlying actions are not covered under the terms of the excess policies.

## V.

■ Finally, we address Liberty Mutual's cross-appeal. In support of its claims for coverage for the ten remaining underlying actions, First Investors referred to Liberty Mutual's payment of the settlement funds in *Hanley* and *Barbosa* in its complaint and in its summary judgment papers. Liberty Mutual responded by filing a counterclaim against First Investors for breach of the settlement agreement, the terms of which provided that "payment of the Settlement Funds shall not be *admitted into evidence* in any proceeding regarding the applicability of insurance coverage" (emphasis added).

In its February 28, 1997 opinion granting summary judgment in Liberty Mutual's favor on the CGL and excess policies, the district court explicitly noted that it "[would] not consider the *Hanley* and *Barbosa* settlements when analyzing whether Liberty Mutual has a duty to defend." *First Investors Corp.,* 955 F.Supp. at 276. Liberty Mutual argues that its agreement was with First Investors, not the district court, and because it was First Investors that (purportedly) breached the agreement, "the fact that *Judge Duffy* did not consider the funding of the settlements in connection with his decision concerning the coverage issues is irrelevant."

■ We are not persuaded. Under New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994). Liberty Mutual has failed to establish both the third and fourth elements of its *prima facie* case. We find that there was no breach because information regarding the settlement funds was *not* in any sense "admitted into evidence"— the district judge refused to consider it in analyzing the issue. *Cf. United Air Lines, Inc. v. Austin Travel Corp.,* 867 F.2d 737, 742–43 (2d Cir.1989) (holding that court was within its discretion to refuse to consider reports that did not meet the Supreme Court's standards for admitting reports into evidence). As Judge Duffy well observed,

[T]he language ["shall not be admitted into evidence"] could not be any clearer. If the parties wanted "no use" of Liberty Mutual's funding of the settlements by First Investors in a subsequent insurance coverage lawsuit, then that is the terminology that the drafters of the [settlement agreement] should have adopted. Draftsmanship is the responsibility of the parties, not the Court. Because the phrase "shall not be admitted into evidence" has a literal

construction that does not defeat the purpose of the [settlement agreement], the phrase must be given its plain everyday meaning.... As neither the complaint nor the summary judgment motion were admitted into evidence, the terms of the [settlement agreement] have not been violated.

Moreover, it is evident that Liberty Mutual cannot prove damages because Liberty Mutual has succeeded in avoiding a duty to defend.

Accordingly, we affirm the district court's order granting First Investors's motion for summary judgment with respect to Liberty Mutual's breach of contract counterclaim.

### VI.

In sum, we hold that

(1) because, under New York law, comprehensive general liability policies insuring against "bodily injury, sickness, and disease" do not cover emotional distress claims arising out of economic losses of the sort alleged in the underlying claims, Liberty Mutual has no duty to defend under those policies;

(2) because First Investors is a "financial institution" within the meaning of the Banks and Financial Institutions endorsements contained in the excess liability policies, Liberty Mutual has no duty to defend under those policies; and

(3) there was no breach of First Investors's settlement agreement with Liberty Mutual arising from First Investors's reference to the two settlements in its complaint and summary judgment papers.

Accordingly, we affirm both the February 28, 1997 Memorandum and Order of the district court granting summary judgment in Liberty Mutual's favor and dismissing First Investors's complaint, *see First Investors Corp.*, 955 F.Supp. at 279, and the district court's October 31, 1997 judgment dismissing Liberty Mutual's breach of contract counterclaim and closing the case, entered pursuant to its October 28, 1997 Memorandum and Order.

REAVLEY, Circuit Judge, specially concurring:

I concur in the court's judgment. My reason for denying coverage, on either the comprehensive or excess insurance, is that the underlying suits are for contractual default and not for liability due to an accidental occurrence. The plaintiffs there claimed damages because First Investors sold them unduly risky mutual funds instead of what the product was represented to be. The claims were predicated on the product sold by First Investors pursuant to their contractual relationship. I conclude that New York courts would hold that no accident or occurrence triggered coverage. *See George A. Fuller Co. v. United States Fidelity & Guar. Co.*, 200 A.D.2d 255, 613 N.Y.S.2d 152 (1st Dep't 1994).