(88 P.3d 798)
No. 90,406

ROCKGATE MANAGEMENT COMPANY, BRADLEY SAX, and MARRIOTT INTERNATIONAL, INC., *Appellants,* v. CGU INSURANCE, INC./PG INSURANCE COMPANY OF NEW YORK, *Appellees.*

 Opinion filed
April 30, 2004. 

*Dan Biles,* of Gates, Biles, Shields & Ryan, P.A., of Overland Park, for appellants.

*David W. Hauber,* of Baty, Holm & Numrich, P.C., of Kansas City, Missouri, for appellees.

Before MARLONE P.J., MARQUARDT and HILL, JJ.

MARQUARDT, J.: Rockgate Management Company, Bradley Sax, and Marriott International, Inc. (collectively, "Rockgate") appeal the trial court's grant of summary judgment to CGU Insurance, Inc./PG Insurance Company of New York (CGU). We affirm.

The Bethesda Full Gospel Church (Bethesda) is a predominantly African-American church located in Buffalo, New York. Mark and Shonder Johnson are youth ministers at Bethesda. In early 1998, Shonder telephoned the Residence Inn to discuss lodging for a youth retreat. Shonder booked two suites, received a confirmation number, and guaranteed the reservation with her credit card.

Prior to the date of the retreat, Shonder visited the Residence Inn to check the accommodations. An employee of the Residence Inn allegedly told Shonder that the group would have "more than enough room" and showed her how furniture could be moved to accommodate sleeping bags. Shonder expressly told Residence Inn

personnel about the plans for the retreat and how many people would be staying in the rooms.

Shortly after some of the young adults had arrived at the hotel on the day of the retreat, they were met by Sax, the Executive Vice President and Chief Operating Officer of Rockgate. Sax told the youth that they could not stay at the hotel because they would make too much noise. Sax allegedly told the Johnsons that "under no circumstances" would they be allowed to stay because they would exceed the occupancy regulations and violate the noise ordinance.

In June 1998, the Johnsons, Bethesda, and other named plaintiffs (Bethesda plaintiffs) brought suit in the United States District Court for the Western District of New York, claiming violations of: (1) 42 U.S.C. § 1981 (2000); (2) 42 U.S.C. § 1985 (2000); (3) 42 U.S.C. § 1986 (2000); (4) 42 U.S.C. § 2000a (2000) and 42 U.S.C. § 2000a-1 (2000); (5) New York civil rights law; (6) New York civil rights law by aiding and inciting; (7) New York human rights law; (8) New York human rights law by aiding, abetting, inciting, compelling, and coercing; (9) breach of contract; (10) tortious interference with contractual relations; and (11) intentional infliction of emotional distress.

Rockgate, a Kansas corporation, was insured by CGU. CGU received notice of the Bethesda plaintiffs' complaint. In June 1998, CGU notified Rockgate that its insurance policy did not cover the claims arising from the Bethesda plaintiffs' lawsuit. Ultimately, Rockgate settled the Bethesda plaintiffs' action out of court.

In May 1999, Rockgate filed a petition for declaratory judgment in the Johnson County District Court, asking the trial court to find that CGU had a duty to defend Rockgate and that CGU was liable to pay all sums to fully indemnify Rockgate for damages, costs, or expenses that Rockgate incurred in the Bethesda plaintiffs' underlying lawsuit. In June 1999, this case was removed to federal court in Kansas. However, in January 2000 the case was remanded to Johnson County after it was determined that diversity jurisdiction did not exist.

After both parties filed motions for summary judgment, the trial court ruled that there can be no insurance coverage for a claim of denial of accommodations based upon racial discrimination. The

trial court found that all of the underlying acts were intentional, which clearly omitted Rockgate from coverage under the CGU policy. Rockgate timely appeals.

Rockgate argues that not all of the claims made by the Bethesda plaintiffs were based on racial discrimination; therefore, some of the claims fell within the scope of policy coverage. Both parties agree that New York law applies. Our standard of review on a question of interpretation of an insurance contract is unlimited. *Progressive Casualty Ins. Co. v. Farm Bureau Mut. Ins. Co.*, 27 Kan. App. 2d 765, 766, 9 P.3d 565, *rev. denied* 270 Kan. 899 (2000).

Insurance policies must be construed as a whole. Every part must be considered, and none of the words of a policy should be disregarded if a rational and intelligent meaning can be given to them, consistent with the general design and object of the whole instrument. *Lee v. Guardian Life Ins. Co. of America*, 187 Misc. 221, 223, 46 N.Y.S.2d 241 (1944).

Generally, when an insurer wishes to exclude coverage from its policy, it must do so in clear and unmistakable language. Such exclusions or exceptions must be specific and clear in order to be enforceable, and are to be accorded a strict and narrow construction. Where the policy is ambiguous, and no extrinsic evidence is offered from which it may be concluded that the policy should be interpreted in favor of the insurer, the policy must be narrowly interpreted in favor of the insured. *Gaetan v. Firemen's Insurance Company of Newark*, 264 App. Div. 2d 806, 808, 695 N.Y.S.2d 608 (1999). However, unambiguous clauses must be given their literal meaning. *Amer. Charm Corp. v. St. Paul Life Ins.*, 53 Misc. 2d 246, 247-48, 278 N.Y.S.2d 270 (1967).

An insurer must provide its insured a defense unless it can show that the allegations of the complaint put it solely within the policy exclusion. The analysis depends on the facts pled, not conclusory assertions. Where it can be determined from the factual allegations that there is no basis for recovery within the coverage of the policy, a court will sustain the insurer's refusal to defend. *Allstate Insurance Company v. Mugavero*, 581 N.Y.S.2d 142, 162-63, 589

N.E.2d 365 (1992); see *Commercial Union Assur. Co., PLC v. Oak Park Marina,* 198 F.3d 55, 59 (2d Cir. 1999).

### *Insurance Policy Section I, Coverage A1*

Rockgate argues that Coverage A of the insurance policy grants them coverage for their claim. Section I, Coverage A1, "Insuring Agreement," states:

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages. We may at our discretion investigate any 'occurrence' and settle any claim or 'suit' that may result."

Section I, Coverage A2, "Exclusions," states:

"This insurance does not apply to:

a. Expected or Intended Injury

'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured. This exclusion does not apply to 'bodily injury' resulting from the use of reasonable force to protect persons or property."

Within the policy, "bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Finally, "property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property."

Rockgate argues that in New York, the term "accident" is broad enough to encompass reckless conduct which causes emotional distress. Rockgate claims that the Bethesda plaintiffs pled intentional infliction of emotional distress in the alternative as a reckless claim, which means that the plaintiffs would not have to prove intent or discrimination for that claim to succeed.

Where a policy excludes coverage for intentional or criminal acts of an insured, the court must look at the actions as a whole in determining whether an "accident," as defined in the policy, has occurred. See *Allstate Insurance Company v. Ruggiero,* 239 App. Div. 2d 369, 370, 658 N.Y.S.2d 321 (1997). In determining whether a policy exclusion covers intentional acts, the relevant inquiry is

whether there is a factual or legal basis upon which to find that the consequences of the acts were not expected or intended. See *Pennsylvania Millers Mutual Insurance Company v. Rigo*, 256 App. Div. 2d 769, 681 N.Y.S.2d 414 (1998).

In 1963, the New York State Superintendent of Insurance determined that acts of discrimination on the basis of race, creed, color, or national origin may not lawfully be written under the New York Insurance Law. A 1989 judicial reaffirmation made it clear that it is against New York public policy to provide insurance coverage against legal liability arising out of the act of discrimination even where the act was unintentional or vicariously imposed. *Am. Mgt. Ass'n. v. Atl. Mut. Ins. Co.*, 168 Misc. 2d 971, 977-78, 641 N.Y.S.2d 802 (1996).

Rockgate contends that the Bethesda plaintiffs' cause of action for intentional infliction of emotional distress was "clearly [pled] alternatively as a reckless, but not intentional act." Rockgate refers to paragraph No. 111 of the Bethesda plaintiffs' complaint, which reads: "These comments and other conduct by defendants, Sax and Rockgate, were intended to cause plaintiffs severe emotional distress and/or constituted a disregard of a substantial possibility of causing severe emotional distress."

In support of its argument, Rockgate cites *Am. Mgt. Ass'n.*, 168 Misc. 2d 971. However, that case clearly addresses the issue of disparate impact discrimination and age discrimination. 168 Misc. 2d at 976-79. In order to state a claim for discrimination under the disparate impact theory, the complaint must allege, at a minimum, that the insured utilized a facially neutral criterion which resulted in a significant discriminatory pattern of behavior. 168 Misc. 2d at 976.

The Bethesda plaintiffs' complaint centers on violations of federal civil rights statutes. Rockgate contends that 42 U.S.C. § 1986 does not require intentional conduct. However, 42 U.S.C. § 1986 is inexorably linked to 42 U.S.C. § 1985, which requires a conspiracy. A conspiracy by its very nature requires intent.

The discrimination alleged by the Bethesda plaintiffs cannot be characterized as reckless. The Bethesda plaintiffs alleged that Sax told them they could not stay at the hotel because they would

"make too much noise" and "under no circumstances" could they rent a room at the Residence Inn, regardless of how many people were in the room. Of course, there is no facially neutral explanation for that claim. The Bethesda plaintiffs specifically alleged that Rockgate's refusal to rent rooms was "a pretense for racial discrimination."

We do not disagree with Rockgate's contention that in some instances, racial discrimination might be covered by insurance. We strongly disagree, however, that this is one of those cases. There is simply no evidence in the record on appeal to support Rockgate's claims that the discrimination was somehow reckless or negligent.

In the alternative, Rockgate argues that the insurance policy's definition of "accident" includes intentional acts where the magnitude of harm was not intended. However, an insurer's duty to defend will not be triggered merely by a claim that the injuries resulted from an intentional act but were unintended, where the harm to the victim was inherent in the nature and force of the act. *Rigo*, 256 App. Div. 2d at 771.

There can be no coverage for damages that flow directly and immediately from an insured's intentional act. *Oak Park Marina*, 198 F.3d at 59. The existence of an insurance company's duty to defend depends upon whether the victim's injuries are inherent in the nature of the insured's conduct. *Pistolesi v. Nationwide Ins.*, 223 App. Div. 2d 94, 97, 644 N.Y.S.2d 819 (1996). For certain types of conduct, cause and effect cannot be separated. In such cases, if the act is intentional, so is the harm, and the courts will not inquire into the perpetrator's subjective intent to cause injury. *Dodge v. Legion Ins. Co.*, 102 F. Supp. 2d 144, 151 (S.D.N.Y. 2000).

This is not a case where the Bethesda plaintiffs suffered some sort of attenuated harm from Sax's actions. Rather, the Bethesda plaintiffs allege direct harm from the intentional act of racial discrimination. Given that fact, any discussion of accidental injury is inapplicable.

Rockgate argues that under New York law, emotional distress without accompanying physical injury is a "bodily injury" within the meaning of the policy language. We do not dispute Rockgate's

claim that an action for intentional infliction of emotional distress may lie even in the absence of a physical injury. In its appellate brief, Rockgate points to a New York court decision which defines "bodily injury" to include mental sickness. However, the policy herein states that "bodily injury" specifically means "bodily injury, sickness or disease sustained by a person." Where the policy defines bodily injury as bodily injury, it seems to imply that actual physical injury must occur for policy coverage. There is a disconnect between the general torts holdings in New York and the specific language of this policy. Of course, the particular language of the policy controls our decision here.

In addition, regardless of the presence of bodily injury, there is no coverage in the absence of an "occurrence." We have already concluded that the intentional behavior undertaken by Sax and the rest of the defendants cannot be an occurrence due to the exclusionary language of the policy. Therefore, the issue of whether there was physical injury is moot. We find no coverage for Rockgate under Section 1, Coverage A of the CGU insurance policy.

### *Insurance Policy Section 1, Coverage B*

Section 1, Coverage B of Rockgate's CGU policy provides insurance for "Personal and Advertising Injury Liability." The language states in relevant part:

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages. We may at our discretion investigate any 'occurrence' or offense and settle any claim or 'suit' that may result."

The policy defines "personal injury" as:

"[I]njury, other than 'bodily injury', arising out of one or more of the following offenses:

. . . .

"c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

"d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services."

Rockgate claims that an average person would reasonably expect coverage for a wrongful eviction after he or she has been "compelled to leave the premises from which they contend they have a contractual right to use." Rockgate also argues that the right of private occupancy is established through contract and not through physical possession. Rockgate believes that the Bethesda plaintiffs came into the right of occupancy with the confirmed reservation.

One New York court has defined "wrongful eviction" as involving actual interference with possessory rights to real property. See *County of Columbia v. Continental Ins.,* 189 App. Div. 2d 391, 395, 595 N.Y.S.2d 988 (1993).

"Eviction" is defined as:

"Dispossession by process of law; the act of depriving a person of the possession of land or rental property which he has held or leased. Act of turning a tenant out of possession, either by re-entry or legal proceedings, such as an action of ejectment. Deprivation of lessee of possession of premises or disturbance of lessee in beneficial enjoyment so as to cause tenant to abandon the premises . . . ." Black's Law Dictionary 555 (6th ed. 1990).

It seems clear that a condition precedent to an action for wrongful eviction is that the person wronged must have been in at least temporary possession of the subject property. Here, the complaint alleges that the Bethesda plaintiffs were "compelled to leave the Residence Inn." However, the complaint clearly indicates that the Bethesda plaintiffs were never inside a hotel room. Their claim was that Rockgate refused to provide accommodations. This is quite different from a situation where someone is provided a room and is subsequently wrongfully evicted. At all relevant times, the Bethesda plaintiffs were in the lobby attempting to check into the hotel. Without occupancy, there is no eviction.

Rockgate also argues that the Bethesda plaintiffs suffered from an invasion of the right of private occupancy. Rockgate characterizes the complaint as alleging a "contractual right" to the assigned rooms, which in turn gives a right of private occupancy.

The key to interpreting the language defining personal injury to include an "invasion of the right of private occupancy" lies in the definitions of "wrongful entry" and "eviction," both of which involve actual interference with possessory rights to real property.

Insurance coverage for invasion of the right of private occupancy is limited to liability for purposeful acts aimed at dispossession of real property by someone asserting an interest therein. *County of Columbia*, 189 App. Div. 2d at 395. The catchall phrase "invasion of the right to private occupancy" encompasses only conduct of the same general type as eviction and wrongful entry. *Pipefitters Welfare Educ. Fund v. Westchester Fire*, 976 F.2d 1037, 1041 (7th Cir. 1992).

In a case that is similar to the facts currently before the court, *Bernstein v. North East Ins. Co.*, 19 F.3d 1456 (D.C. Cir. 1994), the Bernsteins were accused of refusing to rent an apartment to a woman solely because she was African-American. The Bernsteins argued that North East should defend them based on a clause in the policy that provided insurance for "invasion of the right of private occupancy." 19 F.3d at 1457.

The D.C. Circuit noted that the plaintiff never asserted that she at any time acquired the right of private occupancy or that the Bernsteins interfered with that right. Instead, the alleged wrong focused solely on her right to be considered for a possible future right of private occupancy without discrimination. The court found that any action for invasion of the right of private occupancy must be preceded by an actual possessory interest in the subject property. 19 F.3d at 1458.

In this case, there was no occupancy. The "wrongful eviction" and "invasion of the right of private occupancy" language of the policy does not apply to these facts.

Finally, Rockgate argues that CGU should have provided a defense to the Bethesda plaintiffs' claim of slander. Rockgate believes that the Bethesda plaintiffs' claim for intentional infliction of emotional distress incorporated a defamation claim; namely, Sax's statement that the group would "make too much noise." Rockgate contends that this language is enough to constitute a slander claim that would be defensible by CGU.

CGU contends that Rockgate did not properly raise the issue of the Bethesda plaintiffs' slander claim at the trial court level. CGU argues that Rockgate raised the issue at the 11th hour, well after the close of discovery and the submission of all responsive plead-

ings. CGU encourages this court to dismiss this claim on grounds that it was not properly raised at the trial court level.

Rockgate raised the issue of the Bethesda plaintiffs' slander claim shortly before the hearing on CGU's motion for summary judgment. Rockgate admitted that the claim was new. The trial court expressed doubt about the viability of a slander claim, noting that Sax was speaking only about the potential for future disruptive behavior on the part of the Bethesda plaintiffs. It does not appear that the trial court made a decision on the merits of this issue.

Under New York law, the elements of either libel or slander include: "(1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) the publication of the written or oral statements to a third party; and (4) injury to the plaintiff." *Ives v. Guilford Mills, Inc.*, 3 F. Supp. 2d 191, 199 (N.D.N.Y. 1998). When considering whether a statement is slanderous, the statement must be capable of being proven true or false. Unlike a statement of fact, a purely hypothetical statement may be incapable of proof of truth or falsity without probing the mind of the communicator. *Caplan v. Winslett*, 218 App. Div. 2d 148, 151, 637 N.Y.S.2d 967 (1996). Finally, we note that an indispensable element of slander is the communication of the defamation to at least one person other than the person defamed. *Romer v. Portnick*, 78 Misc. 2d 404, 405, 356 N.Y.S.2d 424 (1974).

In the case currently before the court, there is no evidence that anyone but the Bethesda plaintiffs heard Sax's comments about the potential for noise from the group. We believe that this is even more dispositive of the issue than the fact that the statement from Sax was somewhat hypothetical, in that it only predicted future behavior.

After thorough review of all of Rockgate's arguments on appeal, we conclude that the trial court correctly held there is no coverage under the CGU insurance policy and that CGU did not have a duty to defend Rockgate against the intentional acts of racial discrimination alleged here.

Affirmed.