**Carmella M. PINTO, Plaintiff–Appellant,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant–Appellee.**

**Docket No. 98–9356**

United States Court of Appeals, Second Circuit.

Argued: May 24, 1999.

Decided: July 26, 2000.

Philip Russotti, New York, New York (William P. Hepner, Wingate, Russotti & Shapiro, New York, New York, of counsel), for Plaintiff–Appellant.

Evan H. Krinick, Uniondale, New York (Cheryl F. Korman, Rivkin, Radler & Kremer, Uniondale, New York; Howard J. Newman, Saretsky Katz Dranoff & Glass, L.L.P., New York, New York, of counsel), for Defendant–Appellee.

Before: CARDAMONE, JACOBS, and STRAUB, Circuit Judges.

Judge JACOBS dissents in a separate opinion.

CARDAMONE, Circuit Judge:

We confront on this appeal whether an insurance company acted in good faith when it refused to settle a negligence claim against its insured. Because of the company's refusal, judgment was entered against the insured for the amount by which the plaintiff's award exceeded the policy limits. Although an insurance company has a contractual obligation to defend its insured, it also has a contractually defined limit of exposure to plaintiff's suit. An insurer has an economic incentive not to settle, hoping a jury will bring in a verdict for less than the policy limits. But when such hope goes awry, as it did here, the insured is the loser, being personally responsible for the excess. These conflicting interests between the insurer and the insured cause them to rub against each other like unmoored rowboats on a placid pond.

To resolve the conflict, New York implies a duty of good faith in insurance policies requiring the company—when it decides whether to settle a claim—to give the same consideration to its insured's interests as it does its own. Good faith as defined in New York law is an intangible quality, but certainly includes the absence of a design to seek an unconscionable advantage. Generally speaking, good faith imposes a duty on the company to act in accordance with standards of honesty, and in a manner faithful to its obligations.

## BACKGROUND

Plaintiff Carmella M. Pinto, then a 29–year old employee of Shearson, Lehman & Hutton in Manhattan, was seriously injured in an automobile accident in the early afternoon of November 5, 1988 when her vehicle was struck head-on by another vehicle driven by Reginald Bell, an insured of defendant Allstate Insurance Company (Allstate). Because Bell was driving the wrong way down a one-way street, Allstate conceded liability in the negligence action plaintiff brought against Bell in New York State Supreme Court, Richmond County.

Bell's policy insured him for up to $100,000 for bodily injury he negligently caused. Pinto claimed damages in the sum of $1 million. Under the terms of Bell's policy, Allstate was obligated to assume his defense. Because liability was conceded only the issue of damages was contested. Pinto offered to settle her claim for Bell's policy limit of $100,000, but Allstate would only make a pretrial settlement offer of $30,000.

### A. State Court Damages Trial

The damages issue went to trial in state court in November, 1991. Pinto presented proof that she suffered a bulging disk that impinged on a nerve in her neck. She testified that she wore a cervical collar for six months after the accident and underwent physical therapy to relieve the pain in her neck and arm and tingling in her fingers.

Pinto had been an avid athlete. In high school she captained the girls' varsity basketball team, and she continued to play basketball after high school. She bowled and participated in organized softball, and

was a star player on a championship softball team in 1981. In the summer of 1988 she played on another championship softball team and took up golf as well. Pinto told the jury these activities occupied all of her time outside work. Her trial testimony included an extensive description of her pre-accident athletic pursuits and her declaration that as a result of her injuries she could no longer engage in any sports. This came about, as she explained, because she still experienced pain and tingling, as well as difficulty moving her neck, at the time of the trial three years after the accident.

Although Allstate had independent doctors review the plaintiff's medical records and test results, it did not depose Pinto prior to trial. Dennis Hannafey, Esq., the defense counsel who represented Bell on behalf of Allstate, later expressed surprise at the extent of Pinto's athletic achievements revealed by her testimony. Three physicians testified on Pinto's behalf. Their testimony described the disc bulge and apparent nerve damage Pinto had suffered, as well as her extensive physical therapy since the accident.

Allstate called a single witness, a doctor who had examined Pinto once in preparation for litigation. Allstate's doctor testified that he found Pinto's neurological symptoms normal. On cross-examination, this doctor did not dispute Pinto's test results nor that plaintiff could have suffered nerve damage that he did not detect.

### B. *Settlement Negotiations During the State Trial*

During the course of the trial Pinto's attorney made several settlement offers to Allstate for various amounts within the policy range, usually for the full policy amount of $100,000. Allstate rejected each offer and stubbornly stuck to its $30,000 offer to settle Pinto's claim. Yet as the trial progressed it became apparent that a large verdict was in the offing. After the three physicians had testified for Pinto, defense counsel told Allstate claims manager Diana Scheid that in his opinion the case would be lost. But defense counsel did not then or at any later time in the proceedings advise Allstate whether it should or should not settle. After Allstate's doctor testified, Pinto again indicated her willingness to settle for the policy limit. At that time, defense counsel told Allstate senior claims manager Steven Bove that he expected a verdict in excess of the policy. But Allstate did not increase its settlement offer at this point either.

The trial court charged the jury that to sustain a damages award it needed to find either that Pinto had suffered the permanent loss of a body organ, member, function, or system, or alternatively that she had incurred a significant limitation of the use of an organ, member, function, or system. The court instructed the jury that it must have a 5–1 vote in order to return a verdict. During deliberations, the jury asked if it could adjust the amount demanded by the plaintiff. Defense counsel advised Allstate that this question should be viewed as "extremely negative" and that Allstate should be prepared for a "very large verdict." Allstate still made no move to settle.

The jury then returned its first verdict. It found that Pinto had suffered a "significant limitation," one of the alternative findings required to support a damages award, and awarded her $210,000 for this serious injury. The verdict also found that Pinto did not suffer a "permanent loss." But when the court polled the jurors on the latter question, it discovered that the jury had voted 4–2 *for* a finding that Pinto *had* sustained a "permanent loss." The jury explained that it found against Pinto on this question because it did not reach the 5–1 majority required for a verdict in her favor. The judge explained that a 5–1 vote was required on *any* answer to have a verdict, and sent the jury back for further deliberations. Defense counsel reported to Allstate that he felt Pinto was going to "pierce the threshold" and that he expected the judgment would be in "excess of the policy limits." Allstate claims manager

Bove later stated that he was sure Pinto would have accepted the $100,000 policy limit at this point. Again, Allstate made no offer to settle.

The jury then returned a second verdict. It found that Pinto had suffered both a "permanent loss" and a "significant limitation" and awarded her damages of $350,000. A poll of the jury revealed a 5–1 majority on both questions. As noted, of the $350,000 awarded only $100,000 was covered by Bell's insurance policy with Allstate. The court denied defendant's motion to set the verdict aside as excessive. The next day, Allstate offered $100,000 to settle, which Pinto rejected. On appeal the damages award was reduced to $331,200. Allstate paid Pinto the $100,000 limit of Bell's policy, leaving Bell liable to Pinto for the excess.

### C. Plaintiff Sues Allstate in Federal Court for Bad Faith

On March 17, 1995 Bell and Pinto executed an agreement by which Bell, in consideration of a general release from Pinto discharging Bell's liability to her, assigned to Pinto his right to proceed against Allstate for the excess damages due to its alleged bad faith in the settlement negotiations. Pinto then sued Allstate in a diversity suit in the United States District Court for the Eastern District of New York (Glasser, J.) for violating its implied covenant of good faith by recklessly rejecting her settlement demands. The district court determined that although there was evidence of poor judgment on Allstate's part, there was insufficient evidence to allow a reasonable finder of fact to find that Allstate's conduct amounted to bad faith under the standards set out in *Pavia v. State Farm Mutual Automobile Insurance Co.*, 82 N.Y.2d 445, 452–55, 605 N.Y.S.2d 208, 626 N.E.2d 24 (1993). *See Pinto v. Allstate Ins. Co.*, No. 95–CV–2807, 1998 WL 760269, at *2–*5 (E.D.N.Y. Sept.10, 1998). Because the trial court further found no material issues of fact regarding Allstate's good faith, it granted Allstate's motion for summary judgment. Pinto appeals. We reverse.

## DISCUSSION AND ANALYSIS

### Standard of Review

The standard for granting summary judgment is well-known. It is properly granted when the trial court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We review the decision to grant summary judgment *de novo*, and apply the same standard. *See Beatie v. City of New York*, 123 F.3d 707, 710–11 (2d Cir.1997). The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party. *See id.* Summary judgment should not be granted where the record discloses facts that could reasonably support a jury's verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Such is the case here.

### I Bad Faith in Defending and Settling Insurance Claims

#### A. Legal Standard for Bad Faith In New York

Because an insurance company has exclusive control over a claim against its insured once it assumes defense of the suit, it has a duty under New York law to act in "good faith" when deciding whether to settle such a claim, and it may be held liable for breach of that duty. The insurer acts in good faith when it gives equal consideration to its insured's interest in avoiding liability in excess of the policy limit as it does to its own interests when considering plaintiff's demand to settle a lawsuit. *See Pavia*, 82 N.Y.2d at 453, 605 N.Y.S.2d 208, 626 N.E.2d 24; *cf. Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 437–39, 334 N.Y.S.2d 601, 285 N.E.2d

849 (1972) (discussing cases finding bad faith where insurer followed own interests rather than insured's). The duty stems from the fact that when a plaintiff makes a settlement offer within the policy limits, "an inherent conflict arises between the insurer's desire to settle the claim for as little as possible, and the insured's desire to avoid personal liability in excess of the policy limits." *Smith v. General Accident Ins. Co.*, 91 N.Y.2d 648, 653, 674 N.Y.S.2d 267, 697 N.E.2d 168 (1998); *cf. Pavia*, 82 N.Y.2d at 452, 605 N.Y.S.2d 208, 626 N.E.2d 24.

The availability of a bad faith cause of action encourages settlements that are in the insured's best interests, *see Pavia*, 82 N.Y.2d at 452–53, 605 N.Y.S.2d 208, 626 N.E.2d 24, and also discourages insurance companies from refusing to settle as a matter of policy. *Cf.* Michael A. Riccardi, *Battle on Appeal Over Sanction Against Allstate*, 223 N.Y.L.J. 1 (2000) (discussing insurance company litigation strategies and *Saastomoinen v. Pagano*, 183 Misc.2d 781, 704 N.Y.S.2d 796 (Sup.Ct. Nassau Co. 2000), a case in which a judge applied sanctions against an insurance company for failing in bad faith to engage in settlement negotiations).

■ The duty to act in good faith is not breached by an insurer's conduct that amounts to a mistake in judgment or negligence. *See Pavia*, 82 N.Y.2d at 453, 605 N.Y.S.2d 208, 626 N.E.2d 24. Instead, a plaintiff must establish that the insurer's actions displayed a "gross disregard" of its policyholder's interests. This requires a showing that the insurer's conduct involved a "deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer." *Id.* Such failure can be shown by "a pattern of behavior evincing a conscious or knowing indifference to the probability that an insured would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted." *Id.* at 453–54, 605 N.Y.S.2d 208, 626 N.E.2d 24.

■ No pat formula applies to the wide variety of fact patterns that occur, or readily resolves whether an insurer acted in good faith. *See Peterson v. Allcity Ins. Co.*, 472 F.2d 71, 77 (2d Cir.1972). In considering all the facts and circumstances relating to the insurer's investigation of the claim, a number of factors must be evaluated. Among them are plaintiff's likelihood of success on the issue of liability, the potential damages award, the financial burden on each party if the insurer refuses to settle, whether the claim was properly investigated, the information available to the insurer when the demand for settlement was made, and, finally, any other relevant proof tending to establish or negate the insurer's good faith in refusing to settle. *See Pavia*, 82 N.Y.2d at 454–55, 605 N.Y.S.2d 208, 626 N.E.2d 24. In conducting this analysis, a trial court should look to see if there is a high probability that the insured would be subject to personal liability because of the insurer's actions, and whether an excess verdict reasonably could have been predicted. *See Brockstein v. Nationwide Mut. Ins. Co.*, 417 F.2d 703, 707 (2d Cir.1969).

**B.** *Application of Good Faith Standard*

■ The district court first determined that Allstate's investigation was thorough and diligent. It based this conclusion on the fact that Allstate examined all medical documentation related to Pinto's claim and had another physician examine the plaintiff. Allstate's physician noted the abnormality disclosed by Pinto's laboratory tests—the bulging disk—but concluded that the abnormality caused no objective clinical manifestation. Thus, the district court found that Allstate had reason to believe that Pinto's damages were minimal and that it had produced evidence that it made an informed evaluation of the risks of refusing Pinto's settlement demand, though it did not depose her before trial. Pinto's own expert testified that insurance industry standards do not require a deposition of the plaintiff in all personal injury cases.

Balanced against these circumstances weighing in Allstate's favor was the fact that since Allstate had conceded liability, the likelihood of plaintiff's success on that issue was absolute and the only question was the amount of the damage award. Casting doubt on the thoroughness of Allstate's investigation was its failure to depose Pinto, which caused its counsel to be surprised when the extent of her participation in sports and her active lifestyle came out at trial. Although the failure to depose Pinto cannot by itself support a bad faith claim, it is a factor to weigh when examining the circumstances surrounding Allstate's decision not to accept Pinto's settlement offer. It is particularly significant when, as here, the only issue contested at trial was damages. *Cf. Calo v. State Farm Mut. Auto. Ins. Co.*, 251 A.D.2d 280, 672 N.Y.S.2d 804 (2d Dep't), *leave to appeal denied*, 92 N.Y.2d 810, 680 N.Y.S.2d 54, 702 N.E.2d 839 (1998) (insurer taking more than two years to begin investigation insufficient for bad faith because insurer's physician gave opinion that plaintiff's injuries were not causally connected to the accident).

■ With respect to information available to the insurer, Allstate had ample warnings from its attorney about the probability of a jury verdict that would exceed the liability coverage in Bell's policy. It just failed to heed them. The district court noted that both Scheid and Bove testified that the attorney's warnings "did not change their opinion of plaintiff's case." From this testimony the court concluded that the failure to settle amounted to poor judgment, not gross disregard of the insured's interests. In view of the standard set out in *Pavia*, however, we believe that on a motion for summary judgment this conclusion was wrong. *Pavia* makes clear that the gross disregard standard may be satisfied by a finding of recklessness on the part of the insurer. *See* 82 N.Y.2d at 453, 605 N.Y.S.2d 208, 626 N.E.2d 24.

*Pavia* explicitly rejected a "sinister motive" standard that would require conscious malice on the insurer's part to establish a bad faith claim. *Id.* Instead, the Court of Appeals required "a pattern of behavior evincing a conscious or knowing indifference to the probability that an insured would be" subject to personal liability. *Id.* at 453–54, 605 N.Y.S.2d 208, 626 N.E.2d 24. Despite the testimony of Scheid and Bove as to their subjective good faith, a reasonable jury might well find that the failure to heed four warnings from counsel that the company should prepare for a verdict above the policy limit was a gross deviation from the care Allstate in the exercise of good faith owed Bell in protecting his interests. At very least, whether Allstate acted recklessly with regard to its attorney's warnings was another factor in the overall bad faith analysis and presented a question of material fact for a jury to resolve.

Perhaps most damning was Allstate's conduct after the jury's first attempted verdict. The district court stated, without discussion, that Allstate's belief that the false verdict boded well for its case was reasonable. Rather, a rational jury could easily find the opposite. The trial jury attempted to return a verdict finding for Bell on the question of permanent loss, but also found that Pinto had suffered a significant limitation and awarded her $210,000. Allstate's claim adjuster gave a deposition at the bad faith trial in which he stated "[t]he jury was at a four, two margin and never answered the threshold question. At this point, in our judgment we still believed we might have a decent case."

Drawing the inference most favorable to Pinto, as we must, a jury could find that Allstate ignored a clear signal that the state court jury was about to render an award in excess of the policy limit, evincing the required "conscious or knowing indifference to the probability" of an excess verdict. *Pavia*, 82 N.Y.2d at 453–54, 605 N.Y.S.2d 208, 626 N.E.2d 24. Contrary to Allstate's belief, the jury *had* already decided to award Pinto an amount exceeding Bell's policy limit on the signifi-

cant limitation question alone. Moreover, the 4–2 margin was also in Pinto's favor on the remaining permanent loss question. A rational juror might easily find that Allstate's extraordinary argument that these facts somehow augered well for its case, rather than being reasonable, was instead the final piece of a pattern of behavior by Allstate that showed reckless disregard for the interests of the insured.

The final prerequisite for Pinto's bad faith claim is that Allstate lost an actual opportunity to settle at a time when there remained no serious doubt about the insured's liability. *See id.* at 454, 605 N.Y.S.2d 208, 626 N.E.2d 24; *see also Employers Mut. Cas. Co. v. Key Pharms.,* 75 F.3d 815, 823 (2d Cir.1996) (under New York law, plaintiff must show that bad faith prejudiced an actual opportunity to settle the case). Pinto offered to settle for the policy limit several times before and during the trial, and never withdrew that offer. In a letter dated May 30, 1991 counsel for Pinto repeated the demand for the policy limit, and indicated the offer would remain open until the start of jury selection. However, immediately after the jury was empaneled, Pinto's counsel renewed the offer, stating "if the carrier wishes to settle the case for the policy, we will do that now."

In her deposition for the trial below, plaintiff stated that she would have settled for the policy prior to the first verdict, and that she could not recall whether or not she would have settled immediately after that verdict. There was no evidence presented in the district court to show she would *not* have settled after the false verdict or that otherwise negated Pinto's assertion that her offer to settle for the policy was then still open. In addition, Allstate's own claims manager testified he was sure Pinto would have settled for the policy limit after the jury brought in the false verdict.

At least one court construing New York law has noted that plaintiffs' "willingness to settle for the policy limits is one way, but not the only way, to show that an actual opportunity to settle existed." *Hartford Ins. Co. v. Methodist Hosp.,* 785 F.Supp. 38, 40 (E.D.N.Y.1992) (citing *Young v. American Cas. Co.,* 416 F.2d 906 (2d Cir.1969) (in turn asserting under New York law that an insurer has an affirmative duty to pursue settlement negotiations)). Thus, there appears to be no requirement that the plaintiff formally re-offer to settle to show the required lost opportunity. Where a settlement offer is not withdrawn and contains no time limit for acceptance, it would be unreasonable to impose on a plaintiff an ongoing obligation to re-offer a settlement each time a new factor at trial weighs in plaintiff's favor, particularly in light of the insurer's duty to pursue a good faith settlement in the interest of its insured.

Bell's liability was never at issue, and a reasonable jury could conclude that after the false verdict it was no longer seriously in question that the damage award would exceed the policy limit. The district court found that the evidence from the false verdict implied "that she would not have been willing to settle for $100,000." On a motion for summary judgment, the district court erred in construing this implication against her. Pinto reasonably might have read the jury's first attempted verdict as favorable to her and refused to settle. But whether or not Allstate at that point lost an opportunity to settle is a question that must be determined by the trier of fact, not by a trial court inferring plaintiff's likely action from the circumstances and improperly drawing other inferences against her. Certainly Allstate lost an opportunity to *offer* to settle after the false verdict; whether it lost an opportunity to settle was a question in this case for the jury.

## II   Measure of Damages and Release of Liability

### A.   *Proper Measure of Bad Faith Damages When Insured is Indigent*

Allstate contends that even if there are issues of material fact as to its good faith

that preclude summary judgment in its favor, Pinto's suit must be dismissed because of the circumstances surrounding Bell's assignment of his rights to her. Allstate maintains first that there can be no recovery against it because Bell had no assets and therefore did not suffer any damages as a result of the excess judgment against him. Second, Allstate insists that Pinto's action in granting Bell a general release rendered any excess judgment unenforceable. Although the New York Court of Appeals has not spoken directly to either issue, we think both arguments are without merit.

■ In the absence of a decision from a state's highest court, a federal court sitting in diversity must predict how that state's highest court would resolve a question of state law, giving due regard to the rulings of other state courts, and taking into account relevant case law from other jurisdictions. *See First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 165 (2d Cir.1998). The New York Court of Appeals has not addressed whether the insolvency of an insured precludes a bad faith claim for an excess judgment against the insurer. In *Gordon*, the plurality did not reach the damages issue, while the concurrence and dissent disputed the appropriate standard when an excess judgment is uncollectible because the insured is insolvent. *See Gordon*, 30 N.Y.2d 427, 439–40, 334 N.Y.S.2d 601, 285 N.E.2d 849 (Fuld, C.J., concurring) (insured suffers no damages by excess judgment if insured is insolvent); *id.* at 450–51, 334 N.Y.S.2d 601, 285 N.E.2d 849 (Breitel, J., dissenting) (insured may suffer damages from excess judgment even if insolvent but questioning whether the full extent of excess damages should be awarded in all cases); *see also Peterson*, 472 F.2d at 79–81 & 80 n. 14 (noting the dicta in the *Gordon* concurrence and dissent as a principal source on this question of New York law).

■ Two of New York's intermediate appellate courts have taken the position that the insolvency of the insured does not bar recovery of excess judgment damages. The Second Department expressly declined to adopt a rule limiting excess judgment damages in a case where the insured had limited economic means. *See Pavia v. State Farm Mut. Auto. Ins. Co.*, 183 A.D.2d 189, 200, 589 N.Y.S.2d 510 (2d Dep't 1992), *aff'd in part and rev'd on other grounds*, 82 N.Y.2d 445, 605 N.Y.S.2d 208, 626 N.E.2d 24 (1993). Similarly, the First Department stated that "[r]eason as well as economic fact dictates that the mere existence of an excess final judgment causes harm to the judgment debtor. The judgment increases his debts, it damages his credit, it subjects his property to the lien of the ubiquitous judgment." *Henegan v. Merchants Mut. Ins. Co.*, 31 A.D.2d 12, 13, 294 N.Y.S.2d 547 (1st Dep't 1968). The majority of jurisdictions agree that excess judgments are damages in themselves, even where the insured is insolvent, and so properly the subject of awards in bad faith claims. *See Gordon*, 30 N.Y.2d at 448–50, 334 N.Y.S.2d 601, 285 N.E.2d 849 (Breitel, J., dissenting) ("[r]egardless of the insured's financial responsibility most courts automatically adopt the excess judgment as the measure of damages in the insured's [bad-faith] contract action") (listing cases); *Henegan*, 31 A.D.2d at 13–14, 294 N.Y.S.2d 547 (listing cases).

Allstate's actions, whether they be styled reckless, negligent, or simply poor judgment, exposed Bell and his family to an excess judgment in Pinto's favor. In addition to harming his credit rating and exposing any assets he might have or subsequently acquire to lien and seizure, Bell and his family suffered through another four years of uncertainty as Pinto pursued him for the excess judgment before he assigned the bad faith claim to her. It should also be noted that there was no proof introduced in district court that Bell in fact had no assets; the only testimony was a deposition by Allstate's counsel regarding an out-of-court statement by Bell's daughter.

To allow an insurer to escape bad faith liability because its insured lacks the ability to pay an excess judgment would introduce a perverse and undesirable incentive into personal liability actions, discouraging rather than encouraging settlement. Such a rule would allow an insurer who has acted in bad faith to reap a windfall because its insured is of limited means, and would ignore the very real harm an excess judgment can work on an insured's credit and financial future. *See Dumas v. State Farm Mut. Auto. Ins. Co.,* 111 N.H. 43, 45, 274 A.2d 781 (1971); *Gray v. Nationwide Mut. Ins. Co.,* 422 Pa. 500, 505–06, 223 A.2d 8 (1966). In light of the cases cited, we think New York's highest court would not limit the availability of excess judgment damages against an insurance company in cases where its insured is insolvent.

### B. *Availability of Bad Faith Claim After Assignment and Release*

In exchange for Bell's assignment to Pinto of his bad faith claim against Allstate, Pinto gave him a release from personal liability for the excess judgment. Allstate insists that this release rendered the excess judgment Pinto had obtained void and unenforceable against Bell, and for that reason logically extinguished Bell's right to pursue a bad faith claim against Allstate, in effect leaving Bell nothing to assign. We cannot adopt Allstate's argument. Contrary to Allstate's view, assignment of the defendant's bad faith claim to the plaintiff in a personal liability suit is the ordinary mechanism for pursuing such claim against the insurer, usually in exchange for a covenant not to execute on the judgment. *See, e.g., Peterson,* 472 F.2d at 73; *DiLallo v. Fidelity & Cas. Co. of New York,* 355 F.Supp. 519, 521, 522–23 (S.D.N.Y.1973); *Pavia,* 82 N.Y.2d at 451, 605 N.Y.S.2d 208, 626 N.E.2d 24; *Daus v. Lumbermen's Mut. Cas. Co.,* 241 A.D.2d 665, 659 N.Y.S.2d 584 (3d Dep't 1997); *cf. Greevy v. Becker, Isserlis, Sullivan & Kurtz,* 240 A.D.2d 539, 540, 658 N.Y.S.2d 693 (2d Dep't 1997) (assignment of insured defendant's legal malpractice claim). The

question therefore is whether Pinto's use of a release instead of a covenant not to execute (or not to sue or to forbear) as consideration for the assignment of the excess judgment claim renders the excess judgment unenforceable. No New York court has addressed this precise question.

The Supreme Court of Florida has held that when the insured has not assigned his bad faith claim, a release from liability extinguishes that claim. *See Fidelity & Cas. Co. of New York v. Cope,* 462 So.2d 459 (Fla.1985). The court recognized the critical distinction when it held that *"absent a' prior assignment of the cause of action,* once an injured party has released the tortfeasor from all liability, or has satisfied the underlying judgment, no such action may be maintained." *Id.* at 459 (emphasis added).

Allstate cites two cases in support of its contention that the release extinguishes Bell's right to pursue a bad faith action, but can derive little comfort from either. In the first, the Eleventh Circuit construed Florida law to preclude a bad faith action for excess damages. There, the personal injury plaintiff released the insured from the excess judgment while providing that *the insured* would prosecute the bad faith action and assigning only the benefits of that action to the personal injury plaintiff. *See Clement v. Prudential Property & Cas. Ins. Co.,* 790 F.2d 1545, 1546–48 (11th Cir.1986). As in *Cope,* the release in *Clement* did not contain a present assignment of the right to pursue the bad faith claim against the insurer. *See Lageman v. Frank H. Furman, Inc.,* 697 So.2d 981, 983–84 (Fla.Dist.Ct.App.1997) (emphasizing this distinction in *Clement* ). The Eleventh Circuit read *Cope* to say "that if an insured is no longer exposed to any loss in excess of the [policy] limits" the bad faith claim is extinguished. *Clement,* 790 F.2d at 1548. Such is not the case here. Indeed, the court in *Clement* went on to "assume without deciding that the assignment of the insured's claim may serve as consideration for the injured party's re-

lease of the insured from any further liability without at the same time extinguishing the bad faith claim." *See id.*

Allstate's reliance on *National Union Fire Insurance Co. of Pittsburgh v. Continental Illinois Corp.*, 673 F.Supp. 267 (N.D.Ill.1987), is equally unavailing because that case is wholly inapposite. Because the settlement agreement between plaintiff and the insured defendants did not expose defendants to personal liability, the court held that the plaintiff as defendants' assignee could not enforce the settlement against the insurer. *See id.* at 274–75. While the settlement amount exceeded the policy limits, the insured defendants' lack of exposure to personal liability was the decisive factor. *See id.* at 275. It is clear that this holding has no relevance to Pinto's claim against Allstate because whether he could pay it or not, the judgment against Bell left him personally liable for $231,200 after Allstate paid the policy limit. We can find no authority that holds that a release from liability extinguishes an assigned bad faith claim.

■ Further, a release like any contract must be construed to give force and effect to the intention of the parties. *See Plath v. Justus*, 28 N.Y.2d 16, 19, 319 N.Y.S.2d 433, 268 N.E.2d 117 (1971); *see also* Restatement (Second) of Contracts § 284 cmt. c (1981) ("The principal purpose of the obligee is given great weight if it can be ascertained.... If a literal interpretation of a writing that purports to be a release would frustrate that purpose, the writing may be interpreted as a contract not to sue."). Here the parties intended to preserve the bad faith claim and allow Pinto to pursue it as Bell's assignee.

So much is clear from the language of the assignment, which recites "[i]n consideration of a general release from Carmella Pinto, I hereby assign and transfer to Carmella Pinto all my right, title and interest in any claim I may have against Allstate Insurance Company arising out of the manner in which that company defended me...." The release reads "Carmella Pinto, as Releasor, in consideration of Re-

ginald Bell's Assignment of his bad faith cause of action against Allstate Insurance Company...." It defies common sense to believe that Pinto contemplated receiving as consideration for her release of Bell a right of Bell's that no longer existed. Although the parties may not have chosen the ideal form to execute their intention, New York courts have ignored the formal distinction between a release and a covenant not to sue or execute in order to avoid an unjust result. *See, e.g., Gilbert v. Finch*, 173 N.Y. 455, 466, 66 N.E. 133 (1903); *Boll v. Sharp & Dohme, Inc.*, 281 A.D. 568, 569–71, 121 N.Y.S.2d 20 (1st Dep't 1953); *Colton v. New York Hosp.*, 98 Misc.2d 957, 963–66, 414 N.Y.S.2d 866 (Sup.Ct.N.Y.Co.1979).

Consequently, exchange of a general release for an assignment of a bad faith claim operates to preserve the bad faith claim, as if the parties had executed a covenant not to sue, in the same fashion as the exchanges approved in the cases cited above under New York law. While conscious that more careful drafting would have avoided this issue by using the more conventional form of consideration for the assignment, we decline defendant's invitation to exalt form over the spirit of the agreement and to interpret New York law to establish a rule unknown in other jurisdictions and contrary to the prevailing view of New York courts and the intention of the parties in the underlying action.

## CONCLUSION

In sum, whether Allstate acted in bad faith in view of all the facts and circumstances, and whether it lost an opportunity to settle when liability was a foregone conclusion, were questions for a jury in this case. The possibility that the insured was insolvent and the mechanism used to assign plaintiff the insured's right to pursue his bad faith claim for the excess judgment do not bar her recovery.

Accordingly, the grant of summary judgment is reversed and the case remanded to the district court for further proceedings

on the merits of plaintiff's bad faith claim against defendant Allstate.

JACOBS, Circuit Judge, dissenting:

I respectfully dissent on several independent grounds.

## I

To begin with the available common principles, I agree with the majority that in a bad faith claim alleging the wrongful failure to settle by a liability insurer, (i) the insurer's misconduct in defending the underlying claim must be shown to transcend ordinary negligence and to be reckless, *see Pavia v. State Farm Mut. Auto. Ins. Co.*, 82 N.Y.2d 445, 453, 605 N.Y.S.2d 208, 626 N.E.2d 24 (1993), and (ii) an actionable failure to settle for policy limits presupposes the willingness of the plaintiff in the underlying case to accept the limits in settlement, *see id.* at 454, 605 N.Y.S.2d 208, 626 N.E.2d 24. *See generally* Majority Op. at 399, 400 (recklessness), 400–01 (willingness to settle) ("Maj.Op."). As Judge Glasser concluded, these showings were not made here.

### A. *Negligence vs. Recklessness*

The majority opinion cites three defects in the defense provided by the insurer on the tort claim: the failure to depose the tort plaintiff; the failure to heed the warnings of trial counsel; and the failure to settle for policy limits after the false verdict. The majority treats the first two as cumulative events that lead up to the "[p]erhaps most damning" failure, which is the supposed failure to settle after the jury disclosed its view in the false verdict that Pinto's injuries were worth at least twice the policy limit. Maj. Op. at 400. As I read the majority opinion, only at that point is the insurer's conduct held tantamount to recklessness. So I begin there.

*The False Verdict.* The majority opinion characterizes as "[p]erhaps most damning" that the insurer failed to offer its $100,000 policy limits even after the jury returned the false verdict disclosing a finding that the plaintiff had sustained a $210,000 injury. It was never clear, however, that the finding underlying the false verdict was sufficient to support a judgment in that amount. Under New York law, Pinto could not collect a dime for non-economic loss unless the jury found *either unanimously or by a 5–1 margin* that she had suffered a "serious" injury, a term of art defined in Insurance Law § 5102(d) as a personal injury that results in (*inter alia*) "permanent loss of use of a body organ, member, function or system" or "significant limitation of use of a body function or system." N.Y. Ins. Law § 5102(d) (McKinney 1985).

A poll of the jury revealed that the vote on whether Ms. Pinto suffered a permanent loss of the specified kind was 4–2 in favor of plaintiff, but nevertheless short of the 5–1 vote needed to support a verdict on this key question. At this point, Judge Glasser recognized the verdict as defective and instructed the jury to continue its deliberations. Referring to Pinto's dual claims of permanent loss and significant limitation, Judge Glasser told counsel that "[w]e may not have a verdict *on any of these questions*" (emphasis added). The insurer took some comfort from the false verdict, and Judge Glasser ruled that it was "reasonable" for the insurer to believe that the false verdict "bode[d] well for its case." Reasonable or negligent, it was not reckless. In any event, it is undisputed that, due to a failure of communication between Allstate and Bell's counsel, Allstate believed the false verdict to be 4–2 *in its favor*.

*The Failures to Depose and to Heed Warnings.* The majority opinion cites other failures by the insurer leading up to the false verdict. These additional items do not begin to satisfy the recklessness standard required for a bad faith recovery; if they did, a bad faith claim would be a companion action to every case that results in a verdict exceeding policy limits.

The majority opinion concedes that the insurer's failure to depose plaintiff Pinto "cannot by itself support a bad faith claim," but deems that omission important

here because the only issue contested at trial was damages. Maj. Op. at 399–400. However, the opposite proposition would hold at least as much water: one could argue that the failure to depose the tort plaintiff is *more* egregious when liability is disputed than when it is conceded. Where the sole issues contested in a personal injury case are the fact of injury and the amount of damages, the focus is mainly medical, and it is uncontested that the defense in the underlying case reviewed the plaintiff's medical records and performed a medical examination. Unless one rules that good faith requires an insurer to conduct a deposition in every case, it is difficult to deem the omission reckless in this case.

The failure to depose Ms. Pinto is deemed significant by the majority because if Ms. Pinto had been deposed the defense would have learned that she was an avid and accomplished athlete (a circumstance likely to increase her non-economic damages) and the defense would not have been caught off balance by that news at trial. *See* Maj. Op. at 399–400. This type of analysis is "retrospect[ive]" and "hindsight"-based, as Judge Glasser pointed ed out. *Pinto v. Allstate Ins. Co.,* 1998 WL 760269, at *4, *5 (S.D.N.Y. Sept.10, 1998). Two other circumstances diminish the import of Ms. Pinto's testimony concerning her athletic pursuits:

(i) The neurologist retained by the defense, Dr. Rosenblum, examined Ms. Pinto, and opined that the plaintiff was faking:

This patient exhibits some non-physiological findings. This examiner's objective clinical neurological examination was normal. I do take note of the abnormal reports of the MRI cervical spine and EMG examination. This examiner did not find any objective clini[c]al manifestations of same.

*Pinto,* 1998 WL 760269, at *3 (alteration in original). Thus the defense was contesting the fact of injury (as well as the amount of damages), and that defense was not destroyed, or even impacted, by

Ms. Pinto's testimony as to her damages from such an injury.

(ii) Obviously, Ms. Pinto's trial testimony on her athletics would tend to increase her non-economic damages, but it could do nothing to establish that she suffered an injury that was permanent and serious within the definition of Insurance Law § 5102(d), a standard that is not satisfied by diminished athletic performance. And unless she could convince the jury that she had suffered a serious injury—*i.e.,* a personal injury which results in (*inter alia*) "permanent loss of use of a body organ, member, function or system" or "significant limitation of use of a body function or system"—her recovery would fall well short of the $100,000 policy limit. The more one assumes (as the majority does) that the $210,000 false verdict amount was driven by plaintiff's testimony about her lost athletic prowess, the more plausible it becomes that the $210,000 priced a real loss that was nevertheless outside the definition of Insurance Law § 5102(d) and therefore insufficient to sustain non-economic damages. *See* N.Y. Ins. Law. § 5102(d).

The majority opinion faults the insurer for failing to tender its policy limits despite mounting bad news during trial. The majority opinion quotes various warnings from the lawyer for the defense and the insurer's representative at trial. However, the insurer was receiving mixed signals from the courtroom. Only information known to Allstate is relevant to ascertaining whether it acted in bad faith by declining to offer a settlement at the policy limits. But the information available to Allstate fails to support a bad faith finding:

(i) It is undisputed that, due to a miscommunication between Allstate and Bell's counsel, Allstate believed the false verdict to be 4–2 *in its favor.* In any event, the false verdict indicated to Allstate that (ii) the jury was confused, a fact that Allstate might have considered favorable; and (iii) the number of jurors voting against All-

state on the only question polled was insufficient to support an a damage award. (iv) Moreover, counsel for Allstate opined that the prospects for reversal of any unfavorable verdict were good, due to the court's evidentiary decisions. (v) Finally, counsel for Allstate "never advised Allstate to settle. for the policy amount." *Pinto,* 1998 WL 760269, at *4.

Signals were mixed, but it is not unusual for a trial lawyer or a client representative to suffer bouts of panic and funk. The insurer was receiving conflicting reports, and (at least until the false verdict) the insurer could without bad faith pin hope on the opinion of the defense's neurologist, who assured the insurer that the plaintiff was as "phoney as a $3 bill." *Pinto,* 1998 WL 760269, at *3.

As the district court and the majority observe, there is "[n]o pat formula" for distinguishing between conduct that is negligent and conduct that is reckless. Maj. Op. at 399; *accord Pinto,* 1998 WL 760269, at *2 (quoting *Peterson v. Allcity Ins. Co.,* 472 F.2d 71, 77 (2d Cir.1972)). But in this case that distinction is the line between liability and none, and I would affirm the district court, which carefully undertook to tell the difference.

### B. *Availability of Settlement*

According to the majority, "the final prerequisite" to Ms. Pinto's claim is the availability of a settlement within the limits at such time as the insurance company had information so adverse to the policyholder's position that failure to settle would be reckless. As the majority opinion characterizes the record, it is clear that that point was reached when the "[p]erhaps most damning" event transpired, that is, when the jury returned the false verdict. Maj. Op. at 400. But what is the evidence that the plaintiff would have settled for $100,000 after hearing that the jury thought her claim was worth $210,000, especially considering that plaintiff's counsel had assiduously prepared the ground for a bad faith claim?

Proof of this element of Pinto's claim should be easy for Pinto to adduce. She would know whether she would have accepted the $100,000 policy limit in full satisfaction of her claim even after the false verdict was rendered, and her lawyer would know whether that settlement offer then remained open. But when Pinto was asked the question at her deposition in this case, she could not recall. And her counsel at the underlying tort trial does not say whether the offer remained open, and has submitted no affidavit. The majority deems it significant that there is "no evidence" that Pinto would *not* have accepted policy limits after hearing the false verdict. Maj. Op. at 401. But if the tort plaintiff does not know whether she would have accepted the limits in settlement, and her lawyer will not say whether the offer remained open, who *does* know, and who *can* say? It is the burden of the policyholder (and Ms. Pinto's burden, in the policyholder's shoes) to prove the elements of the bad faith claim. The absence of proof on this element should be enough to affirm the district court's grant of summary judgment in favor of the insurance company.

Moreover, as the district court pointed out in rejecting Pinto's argument, the more it is argued that the false verdict predicts the final verdict, the clearer it becomes that the plaintiff would not have settled for the policy limits.

### II

The only damages sought in Pinto's Summary Judgment Motion is the amount of the excess judgment. However, Pinto received her claim by assignment from Bell in exchange for Pinto's release of that obligation. *See* Mem. Supp. Mot. Summ. J. & Opp'n Cross–Mot. at 8, 31, *Pinto v. Allstate* (No. 95 Civ. 2807(ILG)) ("Summ. J. Mot."). I would affirm on the grounds that Bell suffered no demonstrated injury or damages compensable by the insurer. Bell, who is now dead, paid nothing and was in no peril of paying anything for which indemnity was contractually re-

quired. That is so for two independent reasons: he was judgment-proof and was released by the tort plaintiff.

The principles that determine the proper outcome of this appeal—affirmance—are as follows:

- If the insurer has committed bad faith in the defense of a claim and the policyholder has suffered damages as a result, the policyholder has a claim. *See Pavia,* 82 N.Y.2d at 452–53, 605 N.Y.S.2d 208, 626 N.E.2d 24.

- If the policyholder has assets from which the excess judgment has been or may be collected, the measure of damages potentially includes the amount by which the tort judgment exceeds the policy limit.[1] *See, e.g., DiBlasi v. Aetna Life & Cas. Ins. Co.,* 147 A.D.2d 93, 542 N.Y.S.2d 187, 188–89 (2d Dep't 1989).

- If, however, the policyholder is judgment-proof, the measure of damages may include the harm to the policyholder's credit standing, the expenses and consequences of bankruptcy, and so on—but not the amount of the excess judgment. The only New York Court of Appeals case in which this issue was discussed is *Gordon v. Nationwide Mut. Ins. Co.,* 30 N.Y.2d 427, 334 N.Y.S.2d 601, 285 N.E.2d 849 (1972). It was discussed in dicta by four judges, one concurring and three in dissent; but on this issue they were in accord, and were of the view that an insolvent policyholder-defendant cannot collect bad-faith damages in the amount of a judgment that is uncollectible. Chief Judge Fuld observed in his concurrence: "In my view, an insured is not harmed and, by that token, suffers no damage when an uncollectible judgment is entered against him." *Id.* at 440, 334 N.Y.S.2d 601, 285 N.E.2d 849. Judge Breitel in dissent, joined by Judges Burke and Gib-

son, argued that in such a bad faith case with an insolvent plaintiff, an appropriate award is measured by "pecuniary and tangible harm done to the insured," including "the economic harm to the insured *now and in the reasonably anticipated future,*" not by "the full amount of the excess judgment" because the latter award would be "unfair" and "unjust." *Id.* at 450–51, 334 N.Y.S.2d 601, 285 N.E.2d 849 (emphasis added). The majority cites Judge Breitel's dissenting opinion in *Gordon* for the proposition that "[r]egardless of the insured's financial responsibility most courts automatically adopt the excess judgment as the measure of damages in the insured's [bad faith] contract action." Maj. Op. at 402–03 (quoting *Gordon,* 30 N.Y.2d at 448, 334 N.Y.S.2d 601, 285 N.E.2d 849) (alterations in original; internal quotation marks omitted). Tellingly, that passage is talking about courts *other than New York's. See Gordon,* 30 N.Y.2d at 448–49, 334 N.Y.S.2d 601, 285 N.E.2d 849.

- The policyholder can assign a bad faith claim to the tort victim but can only assign such claim as the policyholder has. Neither the plaintiff nor the majority opinion cites a case in which the damages awarded in favor of a judgment-proof policyholder (or policyholder's assignee) is measured by the (unpaid and unpayable) excess judgment.

- Thus, a policyholder who is judgment-proof can assign a claim for certain consequential damages, but not for the unpaid and unpayable amount of a judgment excess of limits, while one who *is* able to pay in full can assign a claim for the amount of the excess judgment (and possibly other consequential damages as well).

---

1. Even if the defendant is not judgment-proof, a tort plaintiff may well prefer to accept the bad faith claim in exchange for a covenant not to execute on the policyholder's assets in order to get punitive damages available in some states, or to avoid devaluing available assets by forced sale, concealment or transfer of assets, tactical bankruptcy, or pauperizing a relative or friend.

• In short, the assignor can give no more than the assignor has.

It follows from all this that Pinto cannot recover damages measured by the excess judgment—which are the only damages she is seeking—because she is the assignee of Bell, and (i) Bell, being judgment-proof, could not pay that obligation and (ii) in any event, Pinto released Bell from liability for it.

*Judgment-proof Policyholder.* On indemnity principles, the holder of a liability insurance contract who is judgment-proof and cannot pay a judgment in excess of the insured limit has no claim against the insurer for that amount. Why this is so is easily demonstrated. If, as the majority posits, Bell assigned this claim, it must be that Bell had the claim to assign notwithstanding the fact that the excess judgment was unpaid. This in turn means that if Bell had gotten a pre-appeal release by paying something more than the policy limits but less than the judgment (a deal that would probably have been acceptable to Ms. Pinto if she had been unaware of circumstances potentially amounting to bad faith), he could have pocketed the difference. It does not matter whether the absence of compensable damages in Bell's bad faith claim stems from his insolvency (as seems to be true in fact) or his favorable settlement (as in my hypothetical). It cannot be thought that Bell could have such a claim or derive so rich a benefit from his tort.

It is elementary that one can assign no more than one has. *See University Mews Assocs. v. Jeanmarie,* 122 Misc.2d 434, 471 N.Y.S.2d 457, 461 (Sup.Ct.1983) (citing *Fairbanks v. Sargent,* 117 N.Y. 320, 22 N.E. 1039 (1889)) ("[A] right or interest is assignable only if at the time of assignment it had an actual or potential existence."). If Bell had no claim for the excess judgment, Pinto cannot have received it as his assignee.

It is therefore critical that Mr. Bell had no assets to speak of. The majority opinion undertakes to blunt this fact as follows: "It should also be noted that there was no proof introduced in the district court that Bell in fact had no assets; the only testimony was a deposition by Allstate's counsel regarding an out-of-court statement by Bell's daughter." Maj. Op. at 402. This is a strange quibble: the statement in question is sworn deposition testimony. Thus, (i) the only evidence is that Bell was judgment-proof; in any event, (ii) it appears that the point is undisputed; certainly, (iii) plaintiff introduced no evidence to show that Bell had assets, a showing essential to this claim for damages. That should be enough to carry the day on a motion for summary judgment.

*Release.* As the majority opinion points out, the "ordinary mechanism" for assigning a bad faith claim to a plaintiff "usually" is effected "in exchange for a covenant not to execute on the judgment," rather than via release. Maj. Op. at 403. That is because a release releases the excess judgment, so that the policyholder's exposure for it ends and the tort plaintiff can no longer execute upon it. Does that mean that the policyholder as assignor therefore cannot effectively convey a claim based upon exposure for a loss from which the policyholder has been released? One would think so. The majority observes that "[n]o New York court has addressed this precise question." *Id.* I am not surprised. It is not commonly argued that assignment *creates* value, damages, or a cause of action, and few courts would have occasion to consider (even to reject) an argument that treats assignment as alchemy. Certainly the majority cites no authority from *any* jurisdiction to support its view that the excess judgment survives the release for *any* purpose.[2]

---

**2.** The release may not have impaired Bell's claims (in Pinto's hands) for other forms of damages potentially valuable to an insolvent policyholder who has been financially impaired (otherwise than by liability for the judgment) and embarrassed by the insurer's wrongful bad faith failure to defend. But the only form of damages sought here is for the excess judgment. *See* Summ. J. Mot. at 8, 31.

## III

It is difficult to ascertain the effect of the majority opinion on this case after remand, or as a general influence. The majority opinion assumes that a judgment-proof *policyholder* is entitled to recover the amount of any tort judgment in excess of policy limits resulting from the insurer's bad faith. But this point is not considered, analyzed, or expressly decided. Since the majority cites a lack of evidence as to whether Bell as policyholder and tortfeasor was in fact judgment-proof, *see* Maj. Op. at 402, the point is not even reached on this appeal, and therefore is no holding.

I emphasize this limit of the majority's holding for two reasons. First, I think it would be unwise to decide that question without certifying it to the New York Court of Appeals. Second, the majority opinion can be misread to say (as it assumes) that a tort plaintiff suing as assignee of the tort defendant can collect from the defendant's insurer on the defendant's bad faith claim the full amount of any judgment exceeding the policy limit without regard to whether that amount measures the policyholder's injury or damages. Such a ruling would have a broad influence on litigation tactics and settlement strategy in many large tort cases. As to this case, it seems to me that the district court and the parties can consider on remand the proper measure of damages, if any.

A similarly broad influence may result from the majority's ruling that a tort plaintiff who has taken by assignment the defendant's bad faith claim need not prove that she would have accepted that payment if offered, or that her offer to accept it was open when the insurer became contractually obligated to settle for it. If, under these rules, a suit against a judgment-proof defendant holding a $10,000 liability indemnity policy · can potentially yield millions, the settlement calculus would be upended in any case (state or federal) potentially involving damages vastly in excess of limits, because negotiations would be influenced at least as much by the prospect of a bad-faith claim as by

the merits of the claim for the underlying tort. The ramifications of this error may be good or bad, but they are surely wide and unpredictable.